**EXHIBIT A**

*From Website: National Institute of Neurological Disorders & Stroke*

**What is transverse myelitis?**

Transverse myelitis is a neurological disorder caused by inflammation across both sides of one level, or segment, of the spinal cord. The term *myelitis* refers to inflammation of the spinal cord; *transverse* simply describes the position of the inflammation, that is, across the width of the spinal cord. Attacks of inflammation can damage or destroy myelin, the fatty insulating substance that covers nerve cell fibers. This damage causes nervous system scars that interrupt communications between the nerves in the spinal cord and the rest of the body.

Symptoms of transverse myelitis include a loss of spinal cord function over several hours to several weeks. What usually begins as a sudden onset of lower back pain, muscle weakness, or abnormal sensations in the toes and feet can rapidly progress to more severe symptoms, including paralysis, urinary retention, and loss of bowel control. Although some patients recover from transverse myelitis with minor or no residual problems, others suffer permanent impairments that affect their ability to perform ordinary tasks of daily living. Most patients will have only one episode of transverse myelitis; a small percentage may have a recurrence.

The segment of the spinal cord at which the damage occurs determines which parts of the body are affected. Nerves in the cervical (neck) region control signals to the neck, arms, hands, and muscles of breathing (the diaphragm). Nerves in the thoracic (upper back) region relay signals to the torso and some parts of the arms. Nerves at the lumbar (mid-back) level control signals to the hips and legs. Finally, sacral nerves, located within the lowest segment of the spinal cord, relay signals to the groin, toes, and some parts of the legs. Damage at one segment will affect function at that segment and segments below it. In patients with transverse myelitis, demyelination usually occurs at the thoracic level, causing problems with leg movement and bowel and bladder control, which require signals from the lower segments of the spinal cord.

**Who gets transverse myelitis?**

Transverse myelitis occurs in adults and children, in both genders, and in all races. No familial predisposition is apparent. A peak in incidence rates (the number of new cases per year) appears to occur between 10 and 19 years and 30 and 39 years. Although only a few studies have examined incidence rates, it is estimated that about 1,400 new cases of transverse myelitis are diagnosed each year in the United States, and approximately 33,000 Americans have some type of disability resulting from the disorder.

**What causes transverse myelitis?**

Researchers are uncertain of the exact causes of transverse myelitis. The inflammation that causes such extensive damage to nerve fibers of the spinal cord may result from viral infections, abnormal immune reactions, or insufficient blood flow through the blood vessels located in the spinal cord. Transverse myelitis also may occur as a complication of syphilis, measles, Lyme disease, and some vaccinations, including those for chickenpox and rabies. Cases in which a cause cannot be identified are called *idiopathic*.

Transverse myelitis often develops following viral infections. Infectious agents suspected of causing transverse myelitis include varicella zoster (the virus that causes chickenpox and shingles), herpes simplex, cytomegalovirus, Epstein-Barr, influenza, echovirus, human immunodeficiency virus (HIV), hepatitis A, and rubella. Bacterial skin infections, middle-ear infections (*otitis media*), and *Mycoplasma pneumoniae* (bacterial pneumonia) have also been associated with the condition.

In post-infectious cases of transverse myelitis, immune system mechanisms, rather than active viral or bacterial infections, appear to play an important role in causing damage to spinal nerves. Although researchers have not yet identified the precise mechanisms of spinal cord injury in these cases, stimulation of the immune system in response to infection

33

CLICNY 0887

indicates that an autoimmune reaction may be responsible. In autoimmune diseases, the immune system, which normally protects the body from foreign organisms, mistakenly attacks the body's own tissue, causing inflammation and, in some cases, damage to myelin within the spinal cord.

Because some affected individuals also have autoimmune diseases such as systemic lupus erythematosus, Sjögren's syndrome, and sarcoidosis, some scientists suggest that transverse myelitis may also be an autoimmune disorder. In addition, some cancers may trigger an abnormal immune response that may lead to transverse myelitis.

An acute, rapidly progressing form of transverse myelitis sometimes signals the first attack of multiple sclerosis (MS), however, studies indicate that most people who develop transverse myelitis do not go on to develop MS. Patients with transverse myelitis should nonetheless be screened for MS because patients with this diagnosis will require different treatments.

Some cases of transverse myelitis result from spinal arteriovenous malformations (abnormalities that alter normal patterns of blood flow) or vascular diseases such as atherosclerosis that cause *ischemia*, a reduction in normal levels of oxygen in spinal cord tissues. Ischemia can result from bleeding (*hemorrhage*) within the spinal cord, blood vessel blockage or narrowing, or other less common factors. Blood vessels bring oxygen and nutrients to spinal cord tissues and remove metabolic waste products. When these vessels become narrowed or blocked, they cannot deliver sufficient amounts of oxygen-laden blood to spinal cord tissues. When a specific region of the spinal cord becomes starved of oxygen, or ischemic, nerve cells and fibers may begin to deteriorate relatively quickly. This damage may cause widespread inflammation, sometimes leading to transverse myelitis. Most people who develop the condition as a result of vascular disease are past the age of 50, have cardiac disease, or have recently undergone a chest or abdominal operation.

### What are the symptoms of transverse myelitis?
Transverse myelitis may be either *acute* (developing over hours to several days) or *subacute* (developing over 1 to 2 weeks). Initial symptoms usually include localized lower back pain, sudden *paresthesias* (abnormal sensations such as burning, tickling, pricking, or tingling) in the legs, sensory loss, and *paraparesis* (partial paralysis of the legs). Paraparesis often progresses to *paraplegia* (paralysis of the legs and lower part of the trunk). Urinary bladder and bowel dysfunction is common. Many patients also report experiencing muscle spasms, a general feeling of discomfort, headache, fever, and loss of appetite. Depending on which segment of the spinal cord is involved, some patients may experience respiratory problems as well.

From this wide array of symptoms, four classic features of transverse myelitis emerge: (1) weakness of the legs and arms, (2) pain, (3) sensory alteration, and (4) bowel and bladder dysfunction. Most patients will experience weakness of varying degrees in their legs; some also experience it in their arms. Initially, people with transverse myelitis may notice that they are stumbling or dragging one foot or that their legs seem heavier than normal. Coordination of hand and arm movements, as well as arm and hand strength may also be compromised. Progression of the disease over several weeks often leads to full paralysis of the legs, requiring the patient to use a wheelchair.

Pain is the primary presenting symptom of transverse myelitis in approximately one-third to one-half of all patients. The pain may be localized in the lower back or may consist of sharp, shooting sensations that radiate down the legs or arms or around the torso.

Patients who experience sensory disturbances often use terms such as *numbness, tingling, coldness,* or *burning* to describe their symptoms. Up to 80 percent of those with transverse

34

CLICNY 0888

myelitis report areas of heightened sensitivity to touch, such that clothing or a light touch with a finger causes significant discomfort or pain (a condition called *allodynia*). Many also experience heightened sensitivity to changes in temperature or to extreme heat or cold.

Bladder and bowel problems may involve increased frequency of the urge to urinate or have bowel movements, incontinence, difficulty voiding, the sensation of incomplete evacuation, and constipation. Over the course of the disease, the majority of people with transverse myelitis will experience one or several of these symptoms.

How is transverse myelitis diagnosed?
Physicians diagnose transverse myelitis by taking a medical history and performing a thorough neurological examination. Because it is often difficult to distinguish between a patient with an idiopathic form of transverse myelitis and one who has an underlying condition, physicians must first eliminate potentially treatable causes of the condition. If a spinal cord injury is suspected, physicians seek first to rule out *lesions* (damaged or abnormally functioning areas) that could cause spinal cord compression. Such potential lesions include tumors, herniated or slipped discs, *stenosis* (narrowing of the canal that holds the spinal cord), and abscesses. To rule out such lesions and check for inflammation of the spinal cord, patients often undergo *magnetic resonance imaging* (MRI), a procedure that provides a picture of the brain and spinal cord. Physicians also may perform *myelography*, which involves injecting a dye into the sac that surrounds the spinal cord. The patient is then tilted up and down to let the dye flow around and outline the spinal cord while X-rays are taken.

Blood tests may be performed to rule out various disorders such as systemic lupus erythematosus, HIV infection, and vitamin B12 deficiency. In some patients with transverse myelitis, the cerebrospinal fluid that bathes the spinal cord and brain contains more protein than usual and an increased number of leukocytes (white blood cells), indicating possible infection. A spinal tap may be performed to obtain fluid to study these factors.

If none of these tests suggests a specific cause, the patient is presumed to have idiopathic transverse myelitis.

How is transverse myelitis treated?
As with many disorders of the spinal cord, no effective cure currently exists for people with transverse myelitis. Treatments are designed to manage and alleviate symptoms and largely depend upon the severity of neurological involvement. Therapy generally begins when the patient first experiences symptoms. Physicians often prescribe corticosteroid therapy during the first few weeks of illness to decrease inflammation. Although no clinical trials have investigated whether corticosteroids alter the course of transverse myelitis, these drugs often are prescribed to reduce immune system activity because of the suspected autoimmune mechanisms involved in the disorder. Corticosteroid medications that might be prescribed may include methylprednisone or dexamethasone. General analgesia will likely be prescribed for any pain the patient may have. And bedrest is often recommended during the initial days and weeks after onset of the disorder.

Following initial therapy, the most critical part of the treatment for this disorder consists of keeping the patient's body functioning while hoping for either complete or partial spontaneous recovery of the nervous system. This may sometimes require placing the patient on a respirator. Patients with acute symptoms, such as paralysis, are most often treated in a hospital or in a rehabilitation facility where a specialized medical team can prevent or treat problems that afflict paralyzed patients. Often, even before recovery begins, caregivers may be instructed to move patients' limbs manually to help keep the muscles flexible and strong, and to reduce the likelihood of pressure sores developing in immobilized areas. Later, if

35

CLICNY 0889

patients begin to recover limb control, physical therapy begins to help improve muscle strength, coordination, and range of motion.

**What therapies are available to help patients left with permanent physical disabilities?**
Many forms of long-term rehabilitative therapy are available for people who have permanent disabilities resulting from transverse myelitis. Medical social workers, often affiliated with local hospitals or outpatient clinics, are the best sources for information about treatment programs and other resources that exist in a community. Rehabilitative therapy teaches people strategies for carrying out activities in new ways in order to overcome, circumvent, or compensate for permanent disabilities. Rehabilitation as yet cannot reverse the physical damage resulting from transverse myelitis or other forms of spinal cord injury. But it can help people, even those with severe paralysis, become as functionally independent as possible and thereby attain the best possible quality of life.

Commonly experienced permanent neurological deficits resulting from transverse myelitis include severe weakness, *spasticity* (painful muscle stiffness or contractions), or paralysis; incontinence; and chronic pain. Such deficits can substantially interfere with a person's ability to carry out everyday activities such as bathing, dressing, and performing household tasks.

People living with permanent disability may feel a range of emotions, from fear and sadness to frustration and anger. Such feelings are natural responses, but they can sometimes jeopardize health and potential for functional recovery. Those with permanent disabilities frequently experience clinical depression. Fortunately, depression is treatable, due to the development of a wide range of medications that can be used with psychotherapeutic treatment.

Today, most rehabilitation programs attempt to address the emotional dimensions along with the physical problems resulting from permanent disability. Patients typically consult with a range of rehabilitation specialists, who may include physiatrists (physicians specializing in physical medicine and rehabilitation), physical therapists, occupational therapists, vocational therapists, and mental health care professionals.

*Physical Therapy*: Physiatrists and physical therapists treat disabilities that result from motor and sensory impairments. Their aim is to help patients increase their strength and endurance, improve coordination, reduce spasticity and muscle wasting in paralyzed limbs, and regain greater control over bladder and bowel function through various exercises. Physiatrists and physical therapists teach paralyzed patients techniques for using assistive devices such as wheelchairs, canes, or braces as effectively as possible. Paralyzed patients also learn ways to avoid developing painful pressure sores on immobilized parts of the body, which may lead to increased pain or systemic infection. In addition, physiatrists and physical therapists are involved in pain management. A wide variety of drugs now exist that can alleviate the pain that results from spinal cord injuries such as those caused by transverse myelitis. These include nonsteroidal anti-inflammatory drugs such as ibuprofen or naproxen; antidepressant drugs such as amitryptyline (tricyclic) and sertraline (a selective serotonin reuptake inhibitor); and anticonvulsant drugs such as phenytoin and gabapentine.

*Occupational Therapy*: Occupational therapists help patients learn new ways of performing meaningful, self-directed, goal-oriented, everyday tasks (*occupations*) such as bathing, dressing, preparing a meal, house cleaning, engaging in arts and crafts, or gardening. They teach people how to develop compensatory strategies, how to make changes in their homes to improve safety (such as installing grab bars in bathrooms), how to change obstacles in their environment that interfere with normal activity, and how to use assistive devices.

*Vocational Therapy*: In addition to acquainting people with their rights as defined under the

36

CLICNY 0890

Americans with Disabilities Act of 1990 and helping people develop and promote work skills, vocational therapists identify potential employers, assist in job searches, and act as mediators between employees and employers to secure reasonable workplace accommodations.

## What is the prognosis?

Recovery from transverse myelitis usually begins within 2 to 12 weeks of the onset of symptoms and may continue for up to 2 years. However, if there is no improvement within the first 3 to 6 months, significant recovery is unlikely. About one-third of people affected with transverse myelitis experience good or full recovery from their symptoms; they regain the ability to walk normally and experience minimal urinary or bowel effects and paresthesias. Another one-third show only fair recovery and are left with significant deficits such as spastic gait, sensory dysfunction, and prominent urinary urgency or incontinence. The remaining one-third show no recovery at all, remaining wheelchair-bound or bedridden with marked dependence on others for basic functions of daily living. Unfortunately, making predictions about individual cases is difficult. However, research has shown that a rapid onset of symptoms generally results in poorer recovery outcomes.

The majority of people with this disorder experience only one episode although in rare cases recurrent or relapsing transverse myelitis does occur. Some patients recover completely, then experience a relapse. Others begin to recover, then suffer worsening of symptoms before recovery continues. In all cases of relapse, physicians will likely investigate possible underlying causes such as MS or systemic lupus erythematosus since most people who experience relapse have an underlying disorder.

## What research is being done?

Within the Federal Government, the National Institute of Neurological Disorders and Stroke (NINDS), one of the National Institutes of Health (NIH), has primary responsibility for conducting and supporting research on spinal cord disorders and demyelinating diseases such as transverse myelitis. The NINDS conducts research in its laboratories at the NIH and also supports studies through grants to major medical institutions across the country.

NINDS researchers seek to clarify the role of the immune system in the pathogenesis of demyelination in autoimmune diseases or disorders. Other work focuses on strategies to repair demyelinated spinal cords including approaches using cell transplantation. The knowledge gained from such research should lead to a greater knowledge of the mechanisms responsible for demyelination in transverse myelitis and may ultimately provide a means to prevent and treat this disorder.

The NINDS also funds researchers who are using animal models of spinal cord injury to study strategies for replacement or regeneration of spinal cord nerve cells. The ultimate goals of these studies are to encourage the same regeneration in humans and to restore function to paralyzed patients. Scientists are also developing neural prostheses to help patients with spinal cord damage compensate for lost function. These sophisticated electrical and mechanical devices connect with the nervous system to supplement or replace lost motor and sensory function. Neural prostheses for spinal cord injured patients are being tested in humans.

## Where can I get more information?

For more information on neurological disorders or research programs funded by the National Institute of Neurological Disorders and Stroke, contact the Institute's Brain Resources and Information Network (BRAIN) at:

37

CLICNY 0891

BRAIN
P.O. Box 5801
Bethesda, MD 20824
(800) 352-9424
http://www.ninds.nih.gov

Information also is available from the following organizations:

**Transverse Myelitis Association**
1787 Sutter Parkway
Powell, OH  43065-8806
info@myelitis.org
http://www.myelitis.org
Tel: 614-766-1806

**American Chronic Pain Association (ACPA)**
P.O. Box 850
Rocklin, CA  95677-0850
ACPA@pacbell.net
http://www.theacpa.org
Tel: 916-632-0922 800-533-3231
Fax: 916-632-3208

**Miami Project to Cure Paralysis/ Buoniconti Fund**
P.O. Box 016960
R-48
Miami, FL  33101-6960
mpinfo@miamiproject.med.miami.edu
http://www.themiamiproject.org
Tel: 305-243-6001 800-STANDUP (782-6387)
Fax: 305-243-6017

**National Chronic Pain Outreach Association (NCPOA)**
P.O. Box 274
Millboro, VA  24460
http://www.chronicpain.org
Tel: 540-862-9437
Fax: 540-862-9485

**National Rehabilitation Information Center (NARIC)**
4200 Forbes Boulevard
Suite 202
Lanham, MD  20706-4829
naricinfo@heitechservices.com
http://www.naric.com
Tel: 301-459-5900/301-459-5984 (TTY) 800-346-2742
Fax: 301-562-2401

top
"Transverse Myelitis Fact Sheet", NINDS.

NIH Publication No. 01-4841

Back to Transverse Myelitis Information Page

Prepared by:

38

Bethesda, MD 20892

NINDS health-related material is provided for information purposes only and does not necessarily represent endorsement by or an official position of the National Institute of Neurological Disorders and Stroke or any other Federal agency. Advice on the treatment or care of an individual patient should be obtained through consultation with a physician who has examined that patient or is familiar with that patient's medical history.

All NINDS-prepared information is in the public domain and may be freely copied. Credit to the NINDS or the NIH is appreciated.

Last updated June 10, 2005

---

National Institute of Neurological Disorders and Stroke

Home | About NINDS | *Disorders* | Funding | News and Events | Find People | Jobs and Training | Accessibility

  

39

CLICNY 0893

**EXHIBIT B**

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

3 Gannett Drive, White Plains, NY 10604-3407
Tel: 914.323.7000   Fax: 914.323.7001

*Albany • Baltimore • Boston • Chicago • Dallas • Garden City • Houston • Las Vegas • London • Los Angeles • McLean*
*Miami • Newark • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford • Washington, DC • White Plains*
*Affiliates: Berlin • Cologne • Frankfurt • Munich • Paris*

—

www.wilsonelser.com

October 4, 2007

**By Email and Regular Mail**

Jason A. Newfield
Frankel & Newfield, P.C.
585 Stewart Avenue
Suite 301
Garden City, NY 11530

RE:    Nancy Trussel v. CIGNA Life Insurance Company of N.Y.
       and Cornell University
       07 CV 6101 (SAS)

Dear Mr. Newfield:

As you are aware, we represent the defendants, CIGNA Life Insurance Company of New York ("CLICNY") and Cornell University ("Cornell") in the captioned matter. We write to respond to your September 26, 2007 regarding the scope of discovery in this case.

The defendants take the position that discovery in this case is limited to the administrative record because this matter is governed by the Employee Retirement Income Security Act ("ERISA"). A primary goal of ERISA is to provide a method to resolve disputes over benefits inexpensively and expeditiously. Miller v. United Welfare Fund, 72, F.3d 1066 (2d Cir. 1995). Unbridled discovery can delay the time required to complete judicial review, in contravention of ERISA's goal of speedy adjudication. Nagele v. Electronic Data Systems Corp., 193 F.R.D. 94, 105 (W.D.N.Y. 2000). Thus, the court must limit discovery in order to expedite the disposition of the action. Nagele, at 105 citing Fed.R.Civ.P.16(a)(1). In deciding whether to grant discovery beyond the administrative record, the court must balance a plaintiff's need for discovery against the fiduciary's interest in prompt disclosure of the dispute in keeping with ERISA's overall policy. Nagele at 105.

In an ERISA case, the decision whether to allow discovery is distinct from the decision whether to allow consideration of additional evidence beyond the administrative record. Anderson v. Sotheby's Inc., 2005 U.S. Dist. LEXIS 9033, *16-18. (S.D.N.Y. 2005). For the court to consider additional evidence beyond the administrative record, plaintiff must show "good cause." Id. In Anderson, the court held that to obtain additional discovery, plaintiff must show "a reasonable chance that the requested discovery will satisfy the good cause requirement." Id at 17. Since *any* requested discovery *might* help to show good cause, the courts set a "reasonableness" standard to prevent plaintiffs from indulging in fishing expeditions. See, Id.

1707789.1

To permit discovery beyond the administrative record, district courts require plaintiff to make a preliminary showing, based on the administrative record, that defendant engaged in wrongdoing. For example, in Samedy, before being granted any discovery, plaintiff presented a statement from a former employee of the defendant corporation who stated that she was under pressure from the company to deny claims. Samedy v. First Unum Life Ins. Co., 2006 U.S. Dist. LEXIS 13375, *5 (E.D.N.Y. 2006). Unlike here, the plaintiff in Samedy offered compelling factual evidence of potential impropriety.

The Anderson court reached a similar result on compelling facts. The decision to allow discovery in Anderson was based in part on a finding that the reviewing committee at the insurance company did not keep records of a large amount of the evidence used in determining the claim. Anderson, at *18-19. Here, the defendants produced a complete record of the claims handling process.

The Court in Porter agreed with the position of its predecessors, holding that:

> ...it is clear that some factual showing must be made before discovery outside the administrative record is allowed and any pretrial discovery should be taken with an eye towards the "good cause" standard. Discovery should be focused, as in Nagele, on a determination of whether the administrative record is complete, and to explain its meaning. 193 F.R.D. at 103. Similarly, as in Harris, discovery geared toward assessing potential conflicts of interest and the clarity of plan language would be proper, particularly if the standard of review has not been determined. 2000 WL 1838308. Porter v. Prudential, 2006 U.S. Dist LEXIS 46069 (S.D.N.Y., Aug. 2, 2006).

Because plaintiff has failed to present compelling factual evidence indicating a need for additional discovery, and because no such evidence exists in the administrative record, defendants take the position that the court should limit the scope of discovery to the contents of the administrative record.

It should be noted that the defendants object to the portion of the September 26 letter suggesting that plaintiff is entitled to CLICNY's claim manual, referred to as the Book of Operating Knowledge. The Book of Operating Knowledge is regarded as a confidential document and is limited to internal use only, stating on its cover:

> The material in this publication is considered proprietary and confidential. This publication is intended for internal use and distribution only. Distribution to any person other than a CIGNA company employee is strictly prohibited.

The Claim Manual contains confidential, proprietary, commercial information regarding the process for handling and investigating claims, and represents a unique compilation of the

specific experience that CLICNY and its related companies has acquired over the years regarding its claim handling and investigative procedures as the result of great time, expense and effort. The manual contains proprietary information that is valuable to competitors. The general dissemination of these exclusive materials and disclosure of internal business policies and proprietary procedures to competitors and to the general public will work to defendants commercial and competitive disadvantage. See Cohen v. Metropolitan Life Ins. Co., No. 00 Civ 6112, 2003 U.S. Dist. LEXIS 4468, * 2-3 (S.D.N.Y. Mar. 26, 2003). Further, based on case law in the Second Circuit, specifically within the Southern District of New York, even a confidentiality agreement will not ensure that the contents of the claim manual will remain confidential, and so will not provide CLICNY with the assurances that it needs. See Levy v. INA Life Ins. Co. of N.Y., No. 05 Civ. 10310, 2006 U.S. Dist. LEXIS 83060 (S.D.N.Y. Nov. 14, 2006); Palmotti v. Metropolitan Life Ins. Co., No. 04 Civ. 718, 2006 U.S.Dist. LEXIS 8031, *3 (S.D.N.Y. Mar. 2, 2006).

Defendant reserves the right to respond to any new arguments raised in plaintiff's reply letter.

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Michelle M. Arbitrio
(MA 2137)

**EXHIBIT C**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

KARINA JOSEPH-MYERS,

            Plaintiff,

    -against-

UNUMPROVIDENT CORPORATION,
FIRST UNUM LIFE INSURANCE COMPANY,
and EDISON-PRICE LIGHTING
INCORPORATED LONG TERM
DISABILITY PLAN,

           Defendants.

------------------------------------------------------x

**MEMORANDUM AND ORDER**
No. 03-CV-0558 (FB)(SMG)

*Appearances:*
*For the Plaintiff:*
ABA HEIMAN, ESQ.
Fusco, Brandenstein & Rada, P.C.
180 Froehlich Farm Blvd.
Woodbury, NY 11797

*For the Defendant:*
CHRISTOPHER G. BROWN, ESQ.
Begos & Horgan, LLP
7 Pondfield Road
Bronxville, NY 10708

**BLOCK, District Judge:**

        Defendants Unumprovident Corporation, First Unum Life Insurance

Company, and Edison-Price Lighting Incorporated Long Term Disability Plan

(collectively, "Unum") appeal a discovery order ("Order")[1] issued by Magistrate Judge

Gold permitting plaintiff Karina Joseph-Myers ("Joseph-Myers") to undertake limited

discovery for the purpose of investigating whether Unum was influenced by a conflict of

------------------------

    [1] Magistrate Judge Gold's Order was delivered orally from the bench on
September 15, 2003. Citations to page numbers refer to the relevant portion of the
transcript.

interest when denying Joseph-Myers's claim for long-term disability benefits under
Unum's employee benefit plan ("Plan").  The Court affirms Magistrate Judge Gold's
Order.

A ruling by a magistrate judge on a nondispositive pretrial matter is subject
to reversal only when "clearly erroneous or contrary to law." 28 U.S.C. §636(b)(1)(A); *see
also Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) (noting that
"[m]atters concerning discovery generally are considered 'nondispositive' of the
litigation" and that "[t]he district court reviews such orders under the 'clearly erroneous
or contrary to law' standard").  A finding is "clearly erroneous" if the reviewing court is
left with the "definite and firm conviction that mistake has been committed." *United States
v. United Gypsum Co.*, 333 U.S. 364, 395 (1948).  A party seeking review of a discovery ruling
"generally bears a heavy burden." *Com-Tech Assocs. v. Computer Assocs. Int'l Inc.*, 753 F.
Supp. 1078, 1099 (E.D.N.Y. 1990).

In permitting limited discovery, Magistrate Judge Gold reasoned that
Joseph-Myers claimed that several former Unum employees involved in eligibility
determinations have made public statements suggesting that Unum pressured them to
deny meritorious disability claims, and that in the absence of discovery, it would be
difficult, if not impossible, for Joseph-Myers to present evidence that the administrator's
conflict influenced the eligibility determination.  Whether Unum was conflicted and
whether that conflict influenced its eligibility determination is relevant because when, as
here, an employee benefit plan vests its administrator with discretion in interpreting the

2

plan's terms, review of the administrator's eligibility decision is subject to an arbitrary and capricious standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). However, when a conflict of interest exists and when the plan administrator was influenced by that conflict, as Joseph-Myers alleges occurred here, review of the eligibility determination is conducted *de novo. See Sullivan v. LTV Aerospace and Defense Co.*, 82 F.3d 1251, 1256 (2d Cir. 1996) ("If the court finds that the administrator was in fact influenced by the conflict of interest, the deference otherwise accorded the administrator's decision drops away and the court interprets the plan *de novo*.").

Unum contends that no discovery should be permitted because whether a conflict existed should be determined solely from within the four corners of the administrative record, adding that discovery on the issue would undercut the congressional intent underlying ERISA to minimize the expense of establishing, maintaining, and administrating employee benefit plans. These arguments are not persuasive. As Magistrate Judge Gold observed, in addition to alleging a conflict based on Unum's dual role as both Plan administrator and insurer, Joseph-Myers has presented evidence that former Unum employees who made eligibility determinations did so under pressure from Unum. *See* Order at 7-8 (Joseph-Myers "has also contended that there are several former employees of the defendant that have made public comments since leaving the defendant's employ about having been pressured by the bureaucracy of the defendant to deny claims that they might otherwise have been inclined to grant."). The Court agrees with Magistrate Judge Gold's assertion that without limited discovery it would be

3

difficult, if not impossible, for claimants who were denied benefits due to a conflict to establish that the administrator's conflict influenced the eligibility determination. *See* Order at 7 ("I can't imagine how the plaintiff could establish or have an opportunity to attempt to establish that a conflict of interest in fact affected the determination of her eligibility . . . for benefits if [she] was precluded from taking discovery on the subject.").

Unum's position that the existence and effect of a conflict of interest must be gleaned solely from the administrative record does not find support in the case law it cites or in logic. In *Wagner v. First Unum Life Ins. Co.*, 2003 U.S. Dist. LEXIS 14245 (S.D.N.Y. Aug. 13, 2003), upon which Unum relies, whether to grant plaintiff discovery was not at issue as "there [was] no evidence that First Unum was influenced by a conflict of interest." *Id.* at *12. In *Tosques v. Unum Life Ins. Co. of America and First Unum Life Ins. Co.*, 02-CV-461 (E.D.N.Y. Sep. 11, 2003), an unpublished Memorandum & Order cited by Unum, plaintiff did not allege a conflict of interest. *See id.* at pages 10-12 of the Memorandum & Order (reciting parties' arguments). In contrast, *Nagele v. Electronic Data Systems Corp.*, 193 F.R.D. 94 (W.D.N.Y. 2000), which Magistrate Judge Gold cited, is directly on-point, thorough, and well-reasoned; there, the court squarely held that the plaintiff was entitled to limited discovery outside the administrative record to investigate whether the plan administrator was conflicted and whether that conflict influenced the denial of benefits. As the *Nagele* court observed, the use of discovery to uncover deficiencies in the administrative process is consistent with ERISA's purpose of protecting workers. *See id* at 104 ("in litigation

involving denials of claims under ERISA covered plans, as with other matters, one can be harmed by what one does not know").  Further, as the *Negele* court noted, the length and scope of discovery can be controlled pursuant to Fed. R. Civ. P. 16(a) (court may confer with parties for purpose of "expediting the disposition of the action" and "enter a scheduling order that limits the time to complete discovery") and Fed. R. Civ. P. 26(c) (authorizing protective orders to limit scope of discovery), thereby alleviating Unum's concerns that limited discovery could prove to be too lengthy and burdensome.  *See id.* at 105 (citing rules).

Finally, the Court notes that Magistrate Judge Gold recognized that Joseph-Myers's original discovery request was overbroad and narrowed it considerably to focus on the precise issue of Unum's alleged conflict.  Having reviewed the Order and the parties' submission, the Court is satisfied that Magistrate Judge Gold's Order is not clearly erroneous or contrary to law; hence, it is affirmed.

SO ORDERED.


_____
FREDERIC BLOCK
United States District Judge


Brooklyn, New York
February __, 2004

5

**EXHIBIT D**

# MLS National Medical Evaluations

The MLS Group of Companies

November 18, 2005

Re:   Nancy Trussel

<u>INDEPENDENT PEER REVIEW</u>

To Whom It May Concern:

<u>LIST OF MEDICAL RECORDS</u>

- Job description CIGNA Insurance dated 03/04/04.

- Job description Human Resources Associate IV Cornell University College of Engineering.

- Transferrable skills analysis performed by CIGNA dated 06/06/05.

- Office progress notes, authorship unknown, dated 12/03/02 through 03/11/05.

- Emergency room records and hospitalization records, Cayuga Medical Center, dated 11/04/03 through 11/30/03.

Corporate Headquarters • 29792 Telegraph Road • Southfield, MI 48034 • P 248.945.9001 • F 248.356.6757 • www.mls-ime.com

CLICNY 0297

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 2

- Office progress notes, Jody Stackman, M.D., dated 03/17/04 through 06/13/05.

- Neurology consultation, Douglas Kerr, M.D., dated 02/25/04.

- Office progress notes, Jeffrey Kadleick, D.P.M., dated 01/06/04 through 04/11/05.

- Office progress note, Beth Dollinger, M.D., dated 06/28/05.

- Physical therapy records including pelvic floor assessment by McCune Ainslie and Associates dated 12/12/03 through 02/03/04.

- Urology consultation, Edward Wright, M.D., dated 09/28/05.

- Multiple MRI's of the neuraxis dated 11/19/03 through 05/07/04.

- Multiple miscellaneous laboratory studies.

- Independent Medical Examination performed by Hector Santana, M.D., dated 05/19/05.

- Report by International Claims Specialist video surveillance dated 05/18/05.

- Correspondence to CIGNA Life Insurance Company of New York from Mark Goidell, Attorney at Law, dated 09/07/05.

- Appeal letter by Nancy Trussel dated 10/11/05.

- Physical ability assessment completed by Jeanne Sullivan, P.T., dated 02/25/04.

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review – Page 3

- Physical ability assessment completed by Frederick Barken, M.D., dated 02/27/04.

- Attending physicians statement signed by Dr. Barken on 02/27/04.

- Functional ability assessment completed by Dr. Douglas Kerr on 10/22/04.

- Physical ability assessment completed by Dr. Frederick Barken on 03/02/05.

- Employee statements dated 02/25/04, 03/05/04 and 12/01/04.

SUMMARY OF MEDICAL DOCUMENTATION

Ms. Nancy Trussel is a 55-year-old female who, at the time of her disability, was employed as a Human Resource advisor. She has been diagnosed with transverse myelitis.

She was employed by Cornell University College of Engineering when in October of 2003 she developed left leg pain, urinary and fecal incontinence, and loss of sensation in her perineal area. Based upon the presence of a rash in her right buttocks, she was thought to possibly have varicella and she was treated with Acyclovir and steroids. She was thought to have had transverse myelitis possibly related to varicella. She underwent MRI studies of the neuraxis which showed areas of abnormal signal within the conus medullaris. The MRI study was

CLICNY 0299

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 4

performed on 11/20/03. An MRI of the brain showed a tiny focal area of increased signal in the subcortical white matter of the left temporal lobe thought to be an incidental finding. CSF studies showed 18 white blood cells, mostly lymphocytes, with a protein of 40, normal being 15-45. IgG index was mildly elevated at 0.80 with normal being less than 0.70. CSF cytology was negative for malignant cells.

Over time, she evolved into a pattern of neuropathic-type pain in her left lower extremity aggravated by prolonged sitting. She remained doubly incontinent of bowel and bladder and had unpredictable accidents with her bowels and bladder. She also complained of loss of sensation in her left leg and symptoms suggestive of a left foot drop.

She was followed by a local neurologist, Dr. Jody Stackman, and was referred to Dr. Douglas Kerr from Johns Hopkins who saw her on 02/25/04, approximately three to four months after the onset of her symptoms. He thought she had an episode of myeloradiculitis possibly related to varicella. He recommended repeating her MRI study, repeating her CSF study and a possible course of IV Ig.

She also underwent a urology evaluation at Johns Hopkins in September of 2005 for a neurogenic bladder. She was advised to use Vesicare and Ditropan XL, and

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 5

they discussed the possibility of sacral neural modulation and the possibility of a cecostomy catheter. Valsalva and cough maneuvers during the cystometrogram showed leakage per the urethra.

There were no follow-up MRI's of the lumbar spine submitted but an MRI of the head with and without contrast on 05/07/04 was normal, and MRI of the T-spine with and without contrast on 03/15/04 was normal. There were no repeat CSF examinations submitted.

Dr. Stackman's follow-up notes indicated persistent problems with neuropathic pain involving the left lower extremity aggravated by prolonged sitting, standing or walking. Also, Ms. Trussel was treated with fairly high doses of Neurontin. Dr. Stackman felt she had relatively normal strength. She had an absent left ankle reflex. She had subjective weakness in the left leg. On 06/13/05, Dr. Stackman wrote a late fee office note rebutting an IME which had been done previously by Dr. Hector Santana. Dr. Stackman felt that Ms. Trussel was not able to sit at a desk nor do any work that involved significant standing, walking, pushing, pulling, lifting or carrying. She stated she was not sure why she was imbalanced. She did not think that this was on the basis of vestibular disease or profound peripheral neuropathy but perhaps due to left leg weakness. She also felt she had an orthopedic or podiatry problem involving the left foot, particularly

CLICNY 0301

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 6

the left toe adjacent to the big toe where there was some mechanical derangement producing pain with standing and impairing her stability.

Dr. Santana's IME performed in May of 2005, approximately 1-1/2 years after the onset of her symptoms, indicated no weakness in the lower extremities but reduced vibration, position sense, touch and temperature, which he felt did not follow any specific radicular or dermatomal level. She had an absent left ankle jerk. He noted that she walked with a mild limp in the left leg. He thought that she had a post-infectious myeloradiculitis affecting the left lower extremity possibly related to a postherpetic type of viral illness. Another possibility could be early MS. He felt she was capable of performing "intellectual work" and has no physical limitations in her upper extremities but had mild limitation with regard to her left lower extremity. He stated her major difficulty was being in an environment where she has no control of her urinary and rectal function. She needed to have an accessible bathroom close to her and that it would be difficult for her to keep attending different meetings where she would have to gather with people.

Dr. Santana completed a physical ability assessment indicating that she could sit continuously, stand or walk occasionally, and reach at a desk level frequently. She could perform fine manipulation and simple grasping continuously, firm

CLICNY 0302

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 7

grasping frequently, could carry up to 10 pounds occasionally, push and pull occasionally, and stoop, kneel, crouch and crawl occasionally. She could see and hear continuously. He made no comment about exposure to machinery. He stated that she could use her lower extremities for foot controls occasionally to frequently.

The attorney letter written by Mr. Goidell indicated that Ms. Trussel was frequently required to travel across the campus at Cornell which was "vast and hilly." She was required to attend national conferences and work long hours. She was suffering from relentless chronic fecal and urinary incontinence which have persisted since the onset of her illness in 2003. Her unpredictable fecal and urinary incontinence episodes make it unreasonable for "any expectation of professional contact in the context of leading and participating in meetings and adhering to tight schedules."

SURVELLANCE REVIEW

The video surveillance performed by International Claims Specialists indicated that Ms. Trussel was observed outside her home traveling in the car for one hour and 53 minutes. She traveled from her home to a doctor's appointment for 18 minutes, remained at the appointment for 52 minutes, and went to a McDonald's

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 8

restaurant where she remained inside for 11 minutes. She then went to a back drive-thru and then to a Salvation Army store where she went shopping for 37 minutes. She walked back to her car put some items into her car and then drove back 20 minutes to her home. The video surveillance indicated that she was able to walk without any obvious signs of distress or instability. She was also observed on 05/17/05 as a passenger in an airport taxi.

## CONCLUSION

**1. Please review the medical information sent to you and comment whether the restrictions and limitations (R&Ls) established by Dr. Stackman that precludes our claimant from work capacity are supported or not supported. Please explain your response.**

The restrictions and limitations supplied by Dr. Stackman, i.e., that Ms. Trussel is incapable of working even in a sedentary fashion, are supported by the medical documentation. Ms. Trussel suffered an episode of transverse myelitis in the Fall of 2003 which has left her with significant symptoms of neuropathic pain involving her left lower extremity and complete urinary and fecal incontinence. This constellation of symptoms would render her incapable of working effectively in her normal job. She is required to attend meetings across the campus of the

CLICNY 0304

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 9

university.  She is required to be present at these meetings and not to be excused at a moments notice to use the bathroom facilities.

The phenomenon of postherpetic pain or neuropathic pain due to a shingles infection is well known.  This often times produces an excruciatingly uncomfortable pain disorder which has been well described in the medical literature and is very difficult to control with medications.  This constellation of severe neuropathic pain involving the left lower extremity plus the combination of complete lack of bowel and bladder control would make it impossible for Ms. Trussel to work.  In her activities statement, she indicates she does drive for short distances.  This is commensurate with the observation of the video surveillance.  However, being able to drive to a doctor's appointment or being able to go to a McDonald's or go to the Salvation Army store does not equate to working effectively in her highly responsible position at the Director of Human Resources for a large university engineering school.

The medical evidence supports that Ms. Trussel has not been capable of working in her normal job as of 06/18/05 through the present time.

2.  If you find the available information conflicting or if you disagree with the attending provider (AP), please contact the claimant's AP, Dr.

Nancy Trussel
Joseph Jares, M.D.
November 18, 2005
Independent Peer Review - Page 10


**Stackman at 607-273-6757.  Please make sure that the difference in your opinion with the AP and conflicting medical information are discussed. Please include separate documentation summarizing this conversation in your report. Please provide a detailed analysis of your findings with thorough review of all the relevant clinical issues.**


N/A.

Joseph Jares, M.D.,
Board Certified Neurology American Academy of Neurology
American Association of Electrodiagnostic Medicine
Diplomate National Board of Medical Examiners

JJ:mh

I further declare under penalty of applicable law that I personally performed this evaluation and prepared this report on the date and location specified. Furthermore, I state under penalty of applicable law that I dictated this report to the MLS transcription service and that I have reviewed the transcribed report and that this report is true and correct.

CLICNY 0306

**EXHIBIT E**

**Lyle, Lisa R    250**

| | |
|---|---|
| **From:** | Lyle, Lisa R    250 |
| **Sent:** | Wednesday, December 14, 2005 2:01 PM |
| **To:** | 'wsmith@mls-ime.com' |
| **Cc:** | Valentino, Rhea    250; SecureMessage |
| **Subject:** | RE: CIGNA Secure Mailbox Re: RE: MLS review, Nancy Trussell |

Wendy,

Hi!  I received the addendum- Thank You!

I know that I explained that we are reviewing her claim based upon her DOT and this is
what we do.  I addressed this because throughout the report the physician makes reference
to things she may not be able to do that are job specific.  I understand that the reviewer
feels she is unable to perform her job or her occupation as outlined by DOT.  However, I
am still in need of some detail around what specific restrictions and limitations are
supported and why so that I may evaluate if she is capable of performing any occupation.

Thank you for your assistance!!

Lisa

Lisa Lyle
CIGNA Group Insurance
Ph#:  412.402.3353
Fax#:  412.402.3222
E-mail:  Lisa.Lyle@CIGNA.com

>***Confidentiality Notice***:  If you have received this e-mail in
>error, please immediately notify the sender by e-mail at the address
>shown.  This e-mail transmission may contain confidential information.
>This information is intended only for the use of the individual(s) or
>entity to whom it was intended even if addressed incorrectly.  Please
>delete it from your files if you are not the intended recipient.  Thank
>you for your compliance.
>
>Confidential, unpublished property of CIGNA.
>Do not duplicate or distribute.
>Use and distribution limited solely to authorized personnel.
>© Copyright 2005 by CIGNA
>
>.

-----Original Message-----
From: wsmith@mls-ime.com [mailto:wsmith@mls-ime.com]
Sent: Wednesday, December 14, 2005 1:33 PM
To: Lyle, Lisa R 250
Subject: CIGNA Secure Mailbox Re: RE: MLS review, Nancy Trussell


This report is complete and will be over to you very shortly.  Thanks

Wendy

--- Original Message ---
Wendy,

When do you think we might expect a response?  Thank You!!!

Lisa

1

CLICNY 1070

Lisa Lyle
CIGNA Group Insurance
Ph#:  412.402.3353
Fax#:  412.402.3222
E-mail:  Lisa.Lyle@CIGNA.com

***Confidentiality Notice***:  If you have received this e-mail in error, please
immediately notify the sender by e-mail at the address shown.  This e-mail transmission
may contain confidential information.  This information is intended only for the use of
the individual(s) or entity to whom it was intended even if addressed incorrectly.  Please
delete it from your files if you are not the intended recipient.  Thank you for your
compliance.

Confidential, unpublished property of CIGNA.
Do not duplicate or distribute.
Use and distribution limited solely to authorized personnel.
© Copyright 2005 by CIGNA

-----Original Message-----
From: Wendy Smith [mailto:wsmith@mls-ime.com]
Sent: Wednesday, December 07, 2005 1:04 PM
To: Valentino, Rhea 250
Cc: Lyle, Lisa R 250
Subject: Re: MLS review, Nancy Trussell


Lisa

This will be taken care of right away.  Thank you.

Wendy

----- Original Message -----
From: Valentino, Rhea 250 <mailto:Rhea.Valentino@CIGNA.com>
To: Wendy Smith <mailto:wsmith@mls-ime.com>
Sent: Wednesday, December 07, 2005 12:48 PM
Subject: FW: MLS review, Nancy Trussell


See below…you may want to respond to Lisa Lyle.

Rhea Valentino RN, CCM.
Phone: 412-402-3272
Fax: 412-402-3222
Nurse Case Manager,  Pittsburgh Claim Office Appeal Team
CIGNA Disability Management Solutions
Pittsburgh, Pennsylvania
Rhea.Valentino@Cigna.com
Do not duplicate or distribute.
Use and distribution limited solely to authorized personnel.
© Copyright 2005 by CIGNA
Confidentiality Notice:  If you have received this e-mail in error, please immediately
notify the sender by e-mail at the address shown.  This e-mail transmission may contain
confidential information.  This information is intended only for the use of the individual
(s) or entity to whom it was intended even if addressed incorrectly.  Please delete from
your files if you are not the intended recipient.  Thank you for your compliance.


-----Original Message-----
From:    Lyle, Lisa R      250
Sent:    Wednesday, December 07, 2005 12:16 PM
To:      Valentino, Rhea       250
Subject:      MLS review, Nancy Trussell

2

CLICNY 1071

Rhea,

I reviewed this peer and we need to go back to MLS with two things. We need to make sure the reviewer knows that we are consider the DOT for cx occupation and not her job. It is Human Resource Advisor and the occupation is light physical demands. Secondly, our question to the reviewer is what restrictions and limitations are supported and why?

Can you contact MLS for clarification? Thank You!

Lisa

Lisa Lyle
CIGNA Group Insurance
Ph#:  412.402.3353
Fax#:  412.402.3222
E-mail:  Lisa.Lyle@CIGNA.com

***Confidentiality Notice***: If you have received this e-mail in error, please immediately notify the sender by e-mail at the address shown. This e-mail transmission may contain confidential information. This information is intended only for the use of the individual(s) or entity to whom it was intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance.

Confidential, unpublished property of CIGNA.
Do not duplicate or distribute.
Use and distribution limited solely to authorized personnel.
© Copyright 2005 by CIGNA

------ -------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information. This information is intended only for the use of the individual (s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance. Copyright 2005 CIGNA =========================================================

------ -------------------------------------------------------------
CONFIDENTIALITY NOTICE: If you have received this email in error, please immediately notify the sender by e-mail at the address shown. This email transmission may contain confidential information. This information is intended only for the use of the individual (s) or entity to whom it is intended even if addressed incorrectly. Please delete it from your files if you are not the intended recipient. Thank you for your compliance. Copyright 2005 CIGNA
=========================================================

CLICNY 1072

**EXHIBIT F**

# MLS National Medical Evaluations
### The MLS Group of Companies

December 12, 2005

Re:   Nancy Trussel

<u>ADDENDUM</u>

To Whom It May Concern:

I have been asked to provide an addendum regarding clarification in my original report on Ms. Trussel which was dated November 18, 2005.

I have reviewed the original report plus Ms. Trussel's occupational description as a Human Resource Advisor.

I would like to modify my report as follows:

CLICNY 1078

Nancy Trussel
Joseph Jares, M.D.
December 12, 2005
Addendum - Page 2

There was an issue in regards to the issue of job versus occupation. In reviewing the Occupational Description of Ms. Trussel, I would like to modify my original report interchanging the references to her "job" to that of her "occupation." I have had the opportunity as outlined in my original report to review the occupational description provided for a "Human Resources Advisor" DOT code number 166.267-046. I have also reviewed in detail the physical requirements, aptitude, etc., of this occupation. My statements as outlined in my original report in regards to Ms. Trussel's occupation remains as is.

If there are any further questions regarding this matter, please do not hesitate to contact me.

I further declare under penalty of applicable law that I personally performed this evaluation and prepared this report on the date and location specified. Furthermore, I state under penalty of applicable law that I dictated this report to the MLS transcription service and that I have reviewed the transcribed report and that this report is true and correct.

Joseph Jares, M.D.,
Board Certified Neurology American Academy of Neurology
American Association of Electrodiagnostic Medicine
Diplomate National Board of Medical Examiners

JJ:ds

CLICNY 1079

**EXHIBIT G**

# MLS National Medical Evaluations
### The MLS Group of Companies

DEC 2 3 20
GROUP LIFE & DISABILITY
BENEFITS OFFICE

December 21, 2005

Re:    Nancy Trussel

<u>ADDENDUM</u>

To Whom It May Concern:

I had previously submitted an Independent Peer Review on November 18, 2005, and an Addendum dated December 12, 2005, regarding Ms. Trussel.

Ms. Trussel has a history of transverse myelitis affecting her conus medullaris/cauda equina and has had residual neuropathic pain involving her left lower extremity aggravated by prolonged sitting. She has also had unpredictable episodes of urinary and fecal incontinence and a left foot drop.

Corporate Headquarters • 29792 Telegraph Road • Southfield, MI 48034 • P 248.945.9001 • F 248.356.6757 • www.mls-ime.com

CLICNY 1084

Nancy Trussel
Joseph Jares, M.D.
December 21, 2005
Addendum - Page 2

The previous review and addendum found that she was not capable of performing at her prior functional level due in combination to her incontinence, left foot drop, and her neuropathic pain.

I have now been asked to clarify if she could work at any occupation.

Based upon the previously submitted medical record, Ms. Trussel would be capable of performing in a sedentary occupational level in which when sitting she would have the opportunity for customary work breaks at a frequency of every 2 hours to change position from sitting to standing for brief periods of time (2-3 minutes). She could walk and stand occasionally, up to 10 minutes at a time, one hour total, in an eight-hour workday. She could not climb. She could not balance. She could not stoop, crawl, kneel, crouch or squat. She could not repetitively use her lower extremities. There is no medical basis to restrict the use of her upper extremities. Because of her use of pain medications she could not work around dangerous machinery and would have to be cautious in her driving. Also, because of her unpredictable bouts of fecal and urinary incontinence she would need immediate access to bathroom facilities. Within the restrictions as outlined above, Ms. Trussel would be capable of functioning in a full time sedentary capacity, as defined by the U.S. Department of Labor.

Nancy Trussel
Joseph Jares, M.D.
December 21, 2005
Addendum - Page 3


If there are any further questions regarding Ms. Trussel's claim, please do not

hesitate to contact me.


I further declare under penalty of applicable law that I personally performed this evaluation and
prepared this report on the date and location specified. Furthermore, I state under penalty of
applicable law that I dictated this report to the MLS transcription service and that I have
reviewed the transcribed report and that this report is true and correct.


Joseph Jares, M.D.,
Board Certified Neurology American Academy of Neurology
American Association of Electrodiagnostic Medicine
Diplomate National Board of Medical Examiners

JJ:ds

**EXHIBIT H**



January 5, 2006


Re:  Nancy Trussel
     Claim Number:        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
     Social Security:     XXX-XX-9666


ADDENDUM


To Whom It May Concern:


I had the opportunity to speak with Dr. Jody Stackman today, January 5, 2006, in regard to Ms. Trussel's clinical status. I attempted to contact him on January 4, 2006, however, the office was closed for the day. He was familiar with Ms. Trussel's history. He indicated that she had residual severe neuropathic pain due to postviral transverse myelitis. He stated she was incontinent of bowel and bladder and was unable to sit for more than two to three minutes. When seen in the office she would have to stand and walk about because of discomfort.

CLICNY 1074

Nancy Trussel
Claim Number 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
Joseph Jares, M.D.
January 5, 2006
Addendum - Page 2

It was Dr. Stackman's opinion that due to residual of Ms. Trussel's transverse myelitis pain she was not able to work because she could not sit for more than a couple of minutes at a time.   I pointed out that there maybe some discrepancy between Ms. Trussel's perceived abilities to sit and stand as noted on the video surveillance obtained in May of 2005, which indicated that she could sit in a car for an hour and thirty-seven minutes traveling to and from doctor appointments.   It was also noted that she was able to travel to a Salvation Army Store and ride in the car for 20 minutes and to a fast food restaurant where she remained inside for 11 minutes.

When asked specifically if Ms. Trussel could be accommodated to work in an occupation that allowed her to sit at a desk and stand and change positions as necessary, Dr. Stackman stated this was not the nature of her position or her occupation.  Also, when asked if she could work at a desk and have immediate access to a bathroom, he stated again that this was not the nature of her occupation.  He stated she could not be accommodated because her occupation required her to sit for several hours at a time.

The information gained from this teleconference with Dr. Stackman does not change my previously submitted opinion.   There appears to be a discrepancy between the presentation of Ms. Trussel to Dr. Stackman in her self-perceived abilities and those gathered from the video surveillance which indicates that she can sit and drive a car for

CLICNY 1075

Nancy Trussel
Claim Number 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
Joseph Jares, M.D.
January 5, 2006
Addendum - Page 3

prolonged periods of time, up to an hour and a half. This would not be in keeping with

Dr. Stackman's report that she could only sit for two to three minutes. Also, it was

surveyed she did not have to stop to use the bathroom during that hour and a half. It

was also noted that she was able to run errands to a fast food restaurant and to the

Salvation Army. It is not known if she used the bathroom facilities at the Salvation

Army or the fast food restaurant, however, even if she did, it would not change the

opinions and statements as outlined in the original report.

I further declare under penalty of applicable law that I personally performed this evaluation and prepared
this report on the date and location specified. Furthermore, I state under penalty of applicable law that I
dictated this report to the MLS transcription service and that I have reviewed the transcribed report and
that this report is true and correct.

Sincerely,

Joseph Jares, M.D.
Board Certified Neurology American Academy of Neurology
American Association of Electrodiagnostic Medicine
Diplomat National Board of Medical Examiners

JJ:ds

CLICNY 1076

**EXHIBIT I**

## Peer Review

| | | | | | |
|---|---|---|---|---|---|
| Name | NANCY TRUSSEL | SSN | 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 | DOB | 07/10/1950 |
| Account Name | CORNELL UNIVERSITY SOL-5 | Account # | NYK0030029 | Incurred Date | 11/21/2003 |
| Claim Manager | Karen Jacobs-Brown | Incident # | 522676 | Claim Eff Dt-Status | 06/10/2005 - Closed |

### ASO Only

| | | | |
|---|---|---|---|
| Customer Approved | | Date | |
| First Name | | Last Name | |

### Peer Review

| | | | |
|---|---|---|---|
| Requested Provider Specialty * | Nephrologist | | |
| Rationale * | Conflicting Medical Information | Specify Other | |
| Vendor Referred Date * | 11/08/2005 | Vendor Acknowledgement Date * | 11/08/2005 |
| Claimant Notification Date * | 11/08/2005 | | |
| Special Instructions | | | |

### Peer Review Provider

| | | | | | |
|---|---|---|---|---|---|
| Provider Specialty * | Neurologist | | | | |
| First Name * | j | Last Name * | Jares | | |
| City * | SOUTHFIELD | State / Province * | MICHIGAN | Zip Code * | 48034 |
| Phone Number | (800)238-2125 | Ext. | | | |
| Fax Number | | | | | |
| Report Received Date * | 11/22/2005 | | | | |
| Outcome * | Does Not Support Functionality | | | | |
| Complete Vendor QA Form | | | | | |

### Vendor Quality Assurance

**Customer Service**

1. The ease in using this vendor service is rated as (on a scale of 1 to 5) *        3
    Where 1 = Very Difficult and 5 = Very Easy

**Impact**

2. Impact/usefulness of the Vendor Service (on a scale of 1 to 5) *        3
    Where 1 = No Impact and 5 = Strong Impact

**Professionalism**

3. Professional Delivery and Quality of Vendor Service (on a scale of 1 to 5) *        3
    Where 1 = Least Professional and 5 = Most Professional

**Follow-up Required**

4. Was an Addendum Needed? *        No
    Reason for Addendum

**Vendor Alert Form**

CLICNY 0133

5. Was a Vendor Alert Form submitted on this referral? *                    No

**Expenses**

6. Were vendor fees within contracted fee schedule? *                      Yes

  Cost *                                                         $ 0.00

If No, provide rationale for additional costs

**Comments**

  QA does not apply
  Peer does not feel EE can work.

---

| **Last Changed User** | Rhea Valentino | | **Last Changed Date** | 11/23/2005 09:10 AM |
|---|---|---|---|---|

---

**Status:**    Completed      **Assigned To:**     Rhea Valentino     **Created:**    11/08/2005 03:36 PM

CLICNY 0134

**EXHIBIT J**

08/01/2005 12:39 FAX  8072569774          HOWARD TRUSSEL                                    ☑01
     '08/01/05  09:53  FAX



Trussell, Nancy
DOB 7/10/1950

June 13, 2005

Ms. Trussell returns to the office today with her complaints continuing as before. Because of a recent disability insurance determination and IME which I was asked to comment on, I spent extra time today reviewing her symptoms, and the circumstances provoking increased symptomatology, and her limitations functionally.

She remains off from work, and is continuing to experience usually "burning" discomfort involving the left leg and both buttocks, there most of the time, occasionally the pain assuming a "aching" quality. The pain is much more prominent with sitting, not with Valsalva's maneuvers, standing, nor walking, and her left leg pain is far more prominent with sitting, more prominent but less so with walking, but not with standing, nor Valsalva's maneuvers. She feels that there is increased weakness of her left leg. She notes imbalance, and has fallen on several occasions, denying any vertigo, tinnitus, hearing loss, nor ear fullness. She denies any paresthesias of her feet and toes.

She has localized pain involving her left toe adjacent to the big toe, more prominent with standing and walking, without redness, swelling, nor warmth there. She has been seen by Dr. Kadliacek, a podiatrist, who feels that she has torn ligaments there. He wants to do surgery. she unfortunately remains incontinent of urine and feces, which markedly limit her abilities to be out socially or in the work place.

She remains on Neurontin 4800 mg, Nortriptyline 40 mg, Effexor 375 mg, and also is taking Lipitor 20 mg, Prempro, Darvocet N100 3 - 4 a day, and Flexeril at bed time which she feels helps with sleep.

She also uses Imitrex as needed for her migraine headaches.

On examination her blood pressure is 136/78 and her pulse is 86 per minute and regular. Lungs are clear to auscultation. Cardiac exam reveals a regular rhythm without murmurs or gallops. Her abdomen was not examined. Extremities show no evidence of hemihypoplasia, joint swelling, redness, nor warmth and in particular there is no swelling, redness, nor warmth involving the left toe adjacent to the big toe, nor the balls of her feet, in particular on the left, although she does have tenderness on the left side involving the area below the toe adjacent to the big toe at or just above the ball of the foot. No trophic skin nor temperature changes are noted on either lower extremity, in particular on the left.

Neurologic exam shows her to be alert, oriented, and not aphasic.
Cranial nerves show full visual fields, equal and reactive pupils, full EOM's without nystagmus, normal facial strength and sensation. Bulbar function is normal. She has excellent strength on the left and right upper extremities and the right lower extremity and has relatively preserved strength on the left lower extremity although it seems perhaps somewhat diminished as compared to that on the right, in particular involving knee flexion. No muscle atrophy nor fasciculations are seen. Reflexes are trace plus at both triceps and the left brachial radialis, trace at the right brachial radialis and both biceps; on her lower extremities her right knee reflex is 2-3+, the left 3+, the right ankle reflex trace plus, the left trace. Babinski responses are absent. Sensory exam demonstrates some hyperesthesias to soft touch involving the lateral aspect of the feet with some diminution of

CLICNY 0356



Nancy Trussell
6/13/05 continued

soft touch involving the dorsum of the left foot as well as circumferentially involving the lower leg on the left; pinprick is reduced involving the left foot and leg, diffusely, without any regional nor radicular variation. Proprioception is intact. Cerebellar testing shows finger to nose to be performed without dysmetria. parietal lobe testing showed no sensory extinction to simultaneous tactile and visual stimuli. Romberg testing is unremarkable. Her gait is not hemiparetic nor spastic in nature.

Clinical Impression: Transverse myelitis with neuropathic pain syndrome - she really is quite debilitated by her present circumstances, limited both professionally and socially to say the least by her fecal and urinary incontinence, which unfortunately has not improved over time. Her dysesthetic pain involving both buttocks and the left leg are more clearly understood. by her presently, and for example their worsening with sitting, the left leg less so with walking makes it veritably impossible for her to actually even work at a sedentary job, and this worsening of her pain with sitting was not fully if at all clearly appreciated by me previously, and I think this has a rather significant impact on her disability determination, and certainly my concurrence with most of the findings and recommendations made by Dr. Santana, who did this IME back on May 19th of this year.

If her ongoing and persistent pain is worsened with sitting, her leg pain with walking, then really she is not able to engage in meaningful employment, certainly not her former employment and she really is unable to sit at a desk and do work as she did previously, nor any work that involves significant standing, walking, nor pushing, pulling, lifting nor carrying. Again, this is not something that I appreciated in the past. She claims to have some weakness of that left leg, and I find perhaps very mild weakness in comparison to her right leg which I think would likely present some impairments for a job requiring sufficient physical activities such as walking, pushing, pulling and carrying, but in everyday existence only presents mild difficulties. I am not certain why she is imbalanced, and certainly it is not on the basis of vestibular disease, nor a profound peripheral neuropathy, but perhaps relates to this left leg weakness that she describes. She is further compromised by what seems to be an orthopedic - podiatry problem involving the left foot and specifically the left toe adjacent to the left big toe where she has some mechanical derangement giving her pain there, certainly worse with standing, likely impairing her stability, and rendering her not only further more uncomfortable, but further impaired.

This unfortunate woman has been handed a very difficult set of circumstances to deal with, with obvious emotional, physical and economic impact.

I think she is on too much Effexor, and I have told her to decrease from 375 to 300 mg, and then two weeks later down to 225 mg. Because of her economic plight and her insurance situation we will try to get her enrolled in the Patient Assistance Program so she can afford this medication. She also is taking Nortriptyline at bed time, which is also more expensive than Amitryptyline, and I am going to switch her over to Amitryptyline 50 mg at bed time. I am also going to try to get her down and off her Cyclobenzaprine, 30 mg a day, decreasing to 20 mg at bed time for a week and then 10 mg at bed time for a week and then discontinuing it. I don't know that Cymbalta can be utilized here with her already on high dose Effexor and I don't know what if any benefit it might provide. I wonder about some spinal cord stimulator here, for her chronic pain or possibly a sympathetic block for what seems like an involving neuropathic pain syndrome, although I don't see any clear trophic skin or temperature changes to suggest a reflex sympathetic dystrophy, suggested otherwise by the nature of her pain.

08/01/2005 12:40 FAX  6072569774        HOWARD TRUSSEL                              Ø03
      08/01/05  09:53  FAX

Nancy Trussell
6/13/05 continued

I have told her that I would advocate on her behalf for a fully disabled determination and that my
previous comments on the IME sent to me in which I indicated some differences with Dr. Santana
regarding Ms. Trussell's ability to crouch, crawl and the nature of her environmental conditions in
essence is in adequate, and not truly reflective of her degree of impairments and the extreme
limitation that are imposed on her because of the nature of her pain and factors triggering
worsening of the pain, again including even sitting. I really think that unfortunately she is totally
disabled from all work activities at present, pending further improvement in her chronic neuropathic
pain syndrome and those improvements are certainly not guaranteed if at all for the future.

She will call me should she have any difficulties with the Elavil, or any increasing symptoms or
signs, and otherwise I will see her back likely in 8 weeks time for follow up.

Jody Stackman, MD
119 W. Buffalo St.
Ithaca, NY 14850
JS/dlr
cc: Frederick Barken, MD

**EXHIBIT K**



C   N   S

Nancy Trussel
DOB 7/10/1950

May 11, 2006

Ms. Trussel returns to the office today, last seen here some three months ago, at which time we started her up on Lyrica, which had to be discontinued after a week, so she went back on Neurontin as she previously had been on, 4800 mgs. She is still on Effexor 225 mgs XR and Elavil 100 mgs at bed time, and she tells me that the pain is "worse". She continues to describe dysethesias involving her left foot and leg, some paresthesias there, and she notes significant pain when sitting, such that she is not able to sit for more than 30 minutes at a time, her leg pain and buttock pain increasing with such an attempt. She also says that with any weight bearing on that left leg her pain is worse, and she continues to have incontinence as before, without improvement. This is a particular challenge for her, both socially and professionally, although she is no longer working now, but is trying to get a job. She is scheduled to have an interview down in Trenton, NJ, in the not too distant future.

She has not been going to physical therapy more recently.

On examination she is normocephalic with a funduscopic examination shows sharp disk margins. Lungs are clear to auscultation. Cardiac examination reveals a regular rhythm at 84 bpm without murmurs, no gallops. Extremities show no evidence of hemihypoplasia, nor any joint swelling, redness, and no warmth. No trophic skin, or temperature changes are noted on the left lower extremity as compared to the right.

Neurological examination:
Mental status-she is alert, oriented, and not aphasic. She has a depressed, anxious, affect. She is fully cooperative and coherent, without obvious cognitive impairments.
Cranial nerves show full visual fields, equal and reactive pupils, full extraocular movements with no nystagmus, and normal facial strength and sensation, as well as normal bulbar function.

Motor examination demonstrates questionably some weakness of ankle dorsiflexion, eversion, inversion, and knee flexion on the left as compared to the right, with no evidence of muscle atrophy nor fasciculations seen. Reflexes are 1-2+ at the knees, 1+ at the right ankle, trace- at the left ankle. Babinski responses are absent bilaterally.

Sensory examination demonstrates some diminution of pinprick and soft touch on the left lower extremity diffusely, particularly involving the foot. Cerebellar testing shows finger-to-nose performed without dysmetria. Romberg testing is unremarkable. Her gait is not spastic, nor hemiparetic on the left, although she tends to favor somewhat the left leg.

Clinical impression: Transverse myelitis with neuropathic pain syndrome and incontinence-she continues on with her unfortunate course, with significant pain involving her buttock and leg, worsened with sitting, the leg pain now worsened with weight bearing, and there has been no improvement in her incontinence which is not going to improve at this point and time. She did not tolerate apparently low dose Lyrica, and is back on Neurontin 4800 mgs a day, in addition to 100 mgs of Elavil at bed time. I have suggested that she try to increase the Neurontin from 4800 to 5100 mgs, and two weeks later if need be and if tolerated up to 5400 mgs, and if 5400 mgs does not seem to work any better than 4800 mgs, or should it not be well tolerated, she is to then decrease back down to 4800 mgs. In that instance she will then increase her Elavil from 100 to 150 mgs at bed time, watching for untoward side effects, and calling me should she have any problems.



Nancy Trussel
May 11, 2006   Page 2

She tells me that she was told by the insurance company that I agreed with the supervising physician overseeing her disability determination that she in fact was not disabled, and I have told her that I never said that, that I shared my difference of opinion with that physician by telephone, not that too long ago, when discussing with him her condition, her disability, at which time he shared with me some of the reported observations that their investigator made of her, including sitting and driving around in a car, going to a fast food restaurant, etc.

It is my opinion that her incontinence and her neuropathic pain, the latter clearly exacerbated by sitting and standing, render her disabled from all forms of employment, and I have stated this in the past and repeat it at this time, as part of her medical record, in disagreement with the insurance company physician determination or at least the opinion expressed to me over the telephone.

I told her that I would be more than willing to testify on her behalf if asked to do so, fill out any forms that need to be filled out, this in addition to having copies of my records forwarded to the disability insurance adjustor.

We will see how she does with the higher dose of Neurontin and/or Elavil, calling me should she have any problems, otherwise returning in three month's time for follow-up.

Jody Stackman, MD
119 W. Buffalo Street
Ithaca, NY 14850
JS/dlj

Cc: Lloyd Darlow, MD

CLICNY 0745

**EXHIBIT L**

NANCY TRUSSEL
409 Taylor Place
Ithaca, NY 14850

September 24, 2006

Heather Zapf
Customer Advocacy Specialist
CIGNA Group Insurance
Routing p250
PO Box 22325
Pittsburgh, PA 15222-0325
FAX 412-402-3222

Dear Ms. Zapf,

Thank you for your letter dated September 12, 2006. In your first sentence you indicate that you are
writing in response to my August 17, 2006 letter to H. Edward Hanway. I believe it is important to point
out that my August letter as well as this letter names you as the direct recipient and the one from whom I
expected a reply. Mr. Hanway was one among four who was copied on the letter, which customarily means
"for information only", not for response.

Once again, you indicate that your review of my file revealed my claim was handled in accordance with
policy. This statement, in and of itself, indicates that you have presumptively concluded that CIGNA was
right, though I (or others) are free to disagree. I cannot understand how it can possibly be within your
policies to distort information and deliberately deceive doctors so that they are misled into concurring with
CIGNA's decision to terminate my claim. I am looking forward to seeing the conclusions reached by the
appeal team and hope they are more objective in their review than you have been in yours.

As previously stated, I find CIGNA's use of the any occupation criteria to be extremely biased. Without
the information about what this means, and that it does not literally mean any occupation, the doctors
made judgments without knowing that you were applying these judgments, not to "any occupations", but
to very specific occupations that, in my case, are not only classified as almost 100% sedentary but are
highly stressful and interactive human resources management positions. Ironically, though Dr. Jares was
given information about my last job, he was told that he was wrong to use this information in his
functional analysis of my limitations and restrictions -- even though they would be essentially the same in
any HR management job. According to your statement, I have to infer that none of these doctors was given
the functional work requirements of the 3 or 4 "any occupations" you came up with in order to compare
them to my functional disabilities that are medically verifiable. Instead, you infer again that they provided
you information in light of the entire universe of occupations. In the absence of the information you even
provided to me, i.e., the job titles of the 3-4 occupations, how valid and reliable can Drs. Jares and
Santana's evaluations be? How could they have formed conclusions about my functionality and the
limitations and restrictions I would require to work when they had no idea what work I would be expected
to perform and under what conditions? At least Dr. Stackman knows the kind of work I did, but it is his
judgment that was completely disregarded in CIGNA's decisions.

In regard to the May or June date when the any occupations criteria took effect and CIGNA terminated my
benefits, of course the claim team had not completed its review by May because they had not yet sent me to
your IME (Dr. Santana) on May 17 and they had not yet performed the surveillance until May 16-18, 2005.
According to the record, CIGNA began the any occupation review in early December, 2004. Why is it
then that the IME visit and the surveillance investigation occurred concurrent with the known May
deadline? That CIGNA extended the deadline "as a customer service to me" was no such thing. I was
told, more than once, that CIGNA's policy was to give a month's notice prior to terminating benefits. I
was informed on June 9, 2005 that my last check would be issued the following week. I had 6 days notice.
. Also, if you recall the information in my file, Cornell mistakenly paid me an additional month of short
term disability covering June, 2004, and CIGNA made the financial adjustment to avoid duplication.
Therefore, rather than pay me for thirteen months of benefits prior to the any occupations criteria being

CLICNY 0721

applied, CIGNA paid me for twelve months, which is both your policy and your norm. Please tell me how any of this was a customer service to me, especially when CIGNA failed to adhere it its own policy in giving one-month's notice? It seems that all the accommodations that were made during this time period favored CIGNA. Please explain to me, in light of the verifiable facts stated above, how it was otherwise.

Once again, as before, you ignore the relevance of the surveillance information. The DVD you sent is an exact duplicate of the first one I received. However, on receiving this second copy, I reviewed it several times to provide the specifics to you in this letter, as follows:

For the days, May 16 and May 17, 2005, there is no footage of me at all. Although the record shows that on May 17, I was driven to Syracuse to be seen by CIGNA's Dr. Santana, there is no footage of me getting in or out of the taxi, in the medical center itself, or sitting at any time -- in the doctor's office, medical center and taxicab. There is also no footage of me entering or exiting the ladies' room at the medical center.

On May 18, the DVD shows the following:

| | | Relevant Footage | Driving Time |
|---|---|---|---|
| Drive to Podiatrist (not shown) | | | 10 min drive |
| Walking to podiatrist's office | 9:14:03 to 9:14:18 | 15 seconds | |
| Leaving the podiatrist's office | 10:06:46 to 10:07:05 | 19 seconds | |
| 52 minutes at Podiatrist (no footage) | | | |
| Drive to McDonalds | 10:07:05 to 10:11:34 | | 4 min drive |
| Leave McDonalds | 10:21:35 | | |
| 10 minutes at McDonalds No footage but a photo of me, standing at a raised table | | | |
| Get in car | 10:21:47 | 12 seconds | |
| Go to drive-through bank | 10:35:19 | | 14 min drive |
| Complete banking/drive away | 10:35:30 | 11 seconds | |
| Drive to Salvation Army | 10:41:12 | | 6 min drive |
| Walk to entrance | 10:41:54 | 42 seconds | |
| Leave Salvation Army | 11:19:15 | | |
| 37 minutes at Salvation Army No footage of me in the store, accessing rest rooms, etc. | | | |
| Walk to/put bundles in car | 11:20:48 | 32 seconds | |
| Drive home | | | 10 min drive |

No evidence of when I returned to my home. The recording shows my car in my driveway at 11:39, an 18-minute drive though it is only a 10-minute drive.

Total amount of time driving: 44 minutes in 4 intermittent short trips, as follows, i.e.,

| | |
|---|---|
| Home to Podiatrist | 10 minutes |
| Podiatrist to McDonalds | 4 minutes |
| McDonalds to Bank, then | |
| Salvation Army | 20 minutes |
| Salvation Army to home | 10 minutes |

Page 2 of 4

CLICNY 0722

There is not even a single instance where there is a visual record of my sitting continuously for more than 20 minutes without parking, getting out of my car and entering a building with rest rooms.

**Total amount of time that there is actual footage of me:  2 minutes and 11 seconds**

The investigative and photographic summaries provided by the surveillance company and commissioned by CIGNA indicate that the investigation covered over 30 hours during the three days, of which 45 minutes were recorded, and of which 6 minutes was "actual footage of the claimant. Somehow, over 4 minutes of this highly relevant footage remains missing.

Once again, I must convey my disappointment about how you dismiss the discrepancies in the surveillance, limiting your response to a single, brief paragraph. In Dr. Jares' full report, he references the written surveillance report while making a decision favorable to my inability to perform sedentary work. Yet in a later addendum, he indicates a discrepancy between my "perceived abilities to sit and stand as noted on the video surveillance obtained in May, 2005... There appears to be a discrepancy between the presentation of Ms. Trussel to Dr. Stackman in her self-perceived abilities and those gathered from the video surveillance which indicates that <u>she can sit and drive a car for prolonged periods of time.</u>"

I believe it is highly significant that there is absolutely no information, from the video surveillance or anywhere else, that indicates I was sitting and driving a car for prolonged periods of time. Where did Dr. Jares get this additional information about a "discrepancy", since it was neither in the written surveillance report or the visual record upon which he based his original decision agreeing with Dr. Stackman and favoring my claim for benefits? Yet, it is entirely based on this "discrepancy" that caused him to reverse himself and end up concurring with CIGNA's decision to terminate my claim.

At this point in the process, I must conclude that CIGNA has sent me the complete written and visual record that you and others reviewed and used to reach the decisions you did. I feel that I cannot express how prejudicial Dr. Jares' final addendum is and also how significant it is in capturing the misinformation he apparently received from a source other than the visual and written surveillance record. I do not think CIGNA has been forthcoming about this "source" nor has anyone explained the four minute absence of "relevant footage of the complainant" in the visual record.

Absent CIGNA's bias to date, for almost three years now, my medical record reveals the undisputed fact that I have an incurable neurological disease characterized by a major spinal cord injury and accompanied by significant, life-altering functional losses that make it impossible to
(a) perform full-time work; (b) perform complex, intellectual and sedentary work assignments and solve problems in "real time", with important ramifications with regard to the work and employment of others; and (c) perform this kind of work continuously in an office environment, with unlimited and unconditional flexibility in my being able to attend to my toileting and personal hygiene needs whenever and wherever they happen to occur..

You mentioned I can request that CIGNA representatives contact my physicians only in writing. I am hereby making this request. Unfortunately, I did not know I had this "right" until your 9/12 letter. I believe that had CIGNA limited itself to this form of communication with my doctors, the breaches in ethics that I have written about at great length would not have occurred.  Unfortunately, they did occur and are fully described in my appeals document and, to some extent, in my last letter to you. I believe that, with this limitation, CIGNA representatives would never have (a) informed Drs. Jares and Stackman that there was visual evidence showing that I was "driving for hours" when no such evidence existed; (b) contacted my primary doctor, Dr. Barken, to coerce him to conclude that since I could do laundry or minor housework, I could perform my office job, managing a human resources department; and (c) contacted my neurologist to challenge his judgment of my medical disabilities when, over a period of almost three years overseeing my medical issues, including two hospitalizations and regular office visits, his statements were deemed worthless and his medical impressions wrong because, allegedly, a surveillance showed I was driving for hours.

You mention in your letter that I requested an Ethics Investigation focused on the preponderance of data that shows how my claim has been mishandled, with great bias toward a presumptive conclusion favoring

Page 3 of 4

CLICNY 0723

CIGNA. The deceit used in questioning my physicians, Drs. Barken and Stackman, and in the information provided to Dr. Jares, is a matter of record. However, you indicate that such an investigation was completed and "no actionable activity occurred." In addition to being dismissive and prejudicial, this sweeping statement essentially closes the book on these issues while failing to address, to any degree of specificity, the scope and details of the investigation that led to this conclusion, and how this relates to actions that are clearly a matter of record. As with the surveillance investigation, I request the written report that came out of this ethics investigation and specifically, the information leading to the conclusion that no actionable activity occurred. To expedite matters, please fax this report to me at 607-272-3273. Since your statement indicates that the ethics investigation was concluded with the above result, I must assume that a written report was provided by whoever conducted the investigation, and that it is available and now part of the record regarding my claim. I therefore anticipate no delay in your sending it to me.

I look forward to getting this report as well as the decision from David Betush and the appeals team.

Sincerely,

Nancy Trussel

cc:     Mr. H., Edward Hanway
        Mr. David Betush

CLICNY 0724

EXHIBIT M

|  | Day) |  |  |
|---|---|---|---|
| **Compensation Frequency** | Monthly | **Compensation Amount** | $ 7104.17 |
| **Integration Method** | 01 - Direct Offset | **Override** | 0 % |
| **Calculation Rounding Indicator** | D - Basic to Next Higher Dollar | **Override Amount** | $ 0.00 |
| **Calculation Basic** | 60 % | **Basic Amount** | $ 4262.50 |
| **Benefit Minimum Amount** | $ 100.00 | **Benefit Maximum Amount** | $ 7500.00 |
| **Flat Benefit Amount** | $ 0.00 | **Gross Benefit Amount** | $ 4263.00 |
| **Net Benefit Amount** | $ 1652.00 | **Net Benefit Type** | N - Gross or Gross less Offsets |
| **Net Benefit Effective Date** | 10/19/2004 |  |  |

## Offset Information

| Offset Type | Status | Effective Date | Term Date | Amount |
|---|---|---|---|---|
| 04 - Primary Disability w/ freeze | 01 - SS Award @ Initial Application | 10/29/2004 |  | $ 1741.00 |
| 01 - Short Term Disability Income | V - Terminated | 05/18/2004 |  | $ 0.00 |
| 06 - Dependent SS with freeze | 01 - SS Award @ Initial Application | 10/29/2004 |  | $ 870.00 |
|  |  |  |  | $ 0.00 |
|  |  |  |  | $ 0.00 |

## Benefit Segment Information

| **Benefit Frequency** | M - One Month (Standard 30 Day) | **Benefit Paid Through Date** | 06/18/2005 |
|---|---|---|---|
| **Compensation Frequency** | Monthly | **Compensation Amount** | $ 7104.17 |
| **Integration Method** | 01 - Direct Offset | **Override** | 0 % |
| **Calculation Rounding Indicator** | D - Basic to Next Higher Dollar | **Override Amount** | $ 0.00 |
| **Calculation Basic** | 60 % | **Basic Amount** | $ 4262.50 |
| **Benefit Minimum Amount** | $ 100.00 | **Benefit Maximum Amount** | $ 7500.00 |
| **Flat Benefit Amount** | $ 0.00 | **Gross Benefit Amount** | $ 4263.00 |
| **Net Benefit Amount** | $ 2522.00 | **Net Benefit Type** | N - Gross or Gross less Offsets |
| **Net Benefit Effective Date** | 11/01/2004 |  |  |

## Offset Information

| Offset Type | Status | Effective Date | Term Date | Amount |
|---|---|---|---|---|
| 04 - Primary Disability w/ freeze | 01 - SS Award @ Initial Application | 10/29/2004 |  | $ 1741.00 |
| 01 - Short Term Disability Income | V - Terminated | 05/18/2004 |  | $ 0.00 |
| 06 - Dependent SS with freeze | J - Benefits Expired | 10/29/2004 | 11/01/2004 | $ |
|  |  |  |  | $ 0.00 |
|  |  |  |  | $ 0.00 |

| **Last Changed User** | William Roschetz | **Last Changed Date** | 12/17/2004 10:59 AM |
|---|---|---|---|

## Additional Note

| | |
|---|---|
| **Created:** | 12/17/2004 10:59 AM |
| **Creator:** | William Roschetz |
| **Type:** | General |
| **Subject:** | ORT |
| **Description:** | |
| | post S5766.84 rsi balance in full recovery |

## Additional Note

| | |
|---|---|
| **Created:** | 08/12/2004 12:10 PM |
| **Creator:** | William Roschetz |
| **Type:** | General |
| **Subject:** | ORT |
| **Description:** | |
| | post S3229.16 rsi recovery in full |

## Additional Note

| | |
|---|---|
| **Created:** | 05/03/2004 07:42 AM |
| **Creator:** | Chris Fisher |
| **Type:** | General |
| **Subject:** | Note from A2K - Waiting for signature |
| **Description:** | |

-----Original Message-----
From: Judy Herigodt [mailto:judy.herigodt@advantage2k.com]
Sent: Friday, April 30, 2004 5:24 PM
To: Sherer, Chris A 250
Subject: Claimant: Nancy Trussel - Initial Claim - PolicyID: NYK 30029

04/30/2004 4:23:21 PM
SSN: 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
Policy Holder: Cornell University / Employer Group: Cornell University / PolicyID: NYK 30029
Claimant: Nancy Trussel - Initial Claim
Client: CIGNA / Chris Sherer (800) 238-2125 - chris.sherer@cigna.com

Dear Chris:

The completed Initial Claim forms were sent to the claimant for signature on 3/25/2004. To date, we have not received the signed Initial Claim forms back from the claimant. We have given the claimant until May 17, 2004 to return the forms back to us.

We will continue to pursue this matter, and send you another status report in two weeks to let you know of my progress in retrieving the Initial Claim.

Thanks for the opportunity to serve CIGNA Group Insurance - Pittsburgh PA FCO.

Sincerely,

Judy Herigodt
Claims Assistant
Advantage 2000 Consultants
One Corporate Dr.
Swansea, IL 62226
(618)212-1100

**ADVANTAGE 2000**
**CONSULTANTS**
*"Your Gateway to Social Security"*

One Corporate Drive • Swansea, IL 62226
P.O. Box 24157 • Belleville, IL 62223
Telephone: 1-800-580-5299 • Fax: 1-314-894-4891
E-mail: customer.service@advantage2k.com

*Date of Referral: 3-15-04*

## SOCIAL SECURITY ASSISTANCE PROGRAM - REFERRAL GUIDE

| | |
|---|---|
| **Company Name:** | **CIGNA Group Insurance** |
| **FCO:** | **Pittsburgh** |
| **Company Address:** | **1600 West Carson St. Ste 300** |
| **City, State and Zip:** | **Pittsburgh, PA 15219** |

| | |
|---|---|
| **Case Manager:** | **Chris Sherer** |
| **CM Phone Number:** | **(800) 238-2125    ext.3431** |

| | |
|---|---|
| **CM Fax Number:** | **(412) 402-3542** |
| **CM Email:** | **chris.sherer@cigna.com** |

Claimant's Name: Nancy Trussel
Policyholder: Cornell University
Policy Number: NYK 30029

Claim Number:

Social Security Number: 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

Date of Birth: 7/10/1950

Telephone Number: (607) 256-9774        Sex: Male ☐        Female ☒

Address: 409 Taylor Drive

        Ithaca, NY 14850

Nature of Disability [Diagnosis]: Transverse myelitis

Date the Disability Began: 11/21/2003        Social Security Estimation Date: 4/20/2004

Has the SSAP been explained to the Claimant? Y ☐ N ☒

What is their marital status?        Married ☐        Widowed ☐
                                     Divorced ☐        Single ☒
Does the disabled person have any minor or disabled children?    YES ☒ NO ☐
Does Family Benefit Offset Apply?                                 YES ☒ NO ☐

Has the Disabled Person applied for Social Security before?
☒ Unknown
☐ Current application or appeal pending
☐ Previous SS application denied.        Date of Last Denial (If Available)

Level of Latest Denial:        Initial App ☐    Recon ☐    Hearing ☐    Appeals Council ☐

Any Occ Date: 5/19/2006
Benefit Term Date: 7/9/2015 MI Limit Applied? YES ☐ NO ☒